| | | |
|---|---|---|
| **WILEY DALLAS JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **NORTH CAROLINA DEPARTMENT OF** | ) | |
| **PUBLIC SAFETY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** comes before the Court on Defendants' Motions for Summary Judgment,

(Doc. No. 62).

## I.    BACKGROUND

*Pro se* incarcerated Plaintiff filed a civil rights suit pursuant to 42 U.S.C. § 1983, the

Americans with Disabilities Act ("ADA"), and Rehabilitation Act ("RA"), and the North Carolina

LAW. Plaintiff claimed that he was denied treatment with breakthrough drugs for his Hepatitis-C

viral ("HCV") infection that are the medical community standard of care, for non-medical reasons.

(Doc. No. 8). The Amended Complaint passed initial review on Plaintiff's claims against

Defendants James Duckworth, Bret Bullis, Chad Green, David W. Guice, Robert Uhren, Frank L.

Perry, Keith D'Amico, Betty Penland,[1] Paula Y. Smith, Renita Stroup, Kathryn Renfro, Cindy

Haynes, Carolyn Buchanan, James Vaughn, Sandra Pitman, Norma Melton, Mike Slagle, and

Mike Ball.  See (Doc. No. 18). Defendants Uhren and D'Amico filed a Motion to Dismiss due to

---

[1] The Motion for Summary Judgment also refers to Jason Penland as a Defendant but he is not a Defendant in this case. See (Doc. No. 8 at 1); (Doc. No. 64 at 1).

Petitioner's failure to exhaust his administrative remedies. (Doc. No. 34). Petitioner failed to respond despite being informed of his right to do so pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and Defendants Uhren and D'Amico's Motion was granted on July 27, 2018. (Doc. No. 58). The remaining Defendants have now filed the instant Motion for Summary Judgment. (Doc. No. 62).

**(1)  Amended Complaint** (Doc. No. 8)

Plaintiff alleges in his unverified[2] Amended Complaint that NCDPS does not screen incoming inmates for Hepatitis-C virus and, for inmates who have been diagnosed with Hepatitis-C, and refuses to provide "breakthrough" 12-week oral pill treatment until infected inmates have experienced severe and irreversible liver damage.

He argues Guice, as Commissioner of NCDPS, is responsible for policy and procedure, administration, and supervision of staff and employees within NCDPS during the relevant time. Perry, as secretary of NCDPS, is responsible for oversight, operation, and administration of DPS including providing appropriate medical treatment and formulating policy and procedure to ensure the provision of treatment for Plaintiff and those similarly situated. Smith, as NCDPS medical director, serves on the Utilization Review Board, and is responsible for overseeing delivery of all medical services in division of prisons as well as the establishment of medical policy and procedure that governs the med treatment of all inmates in the division of prisons. Regional Medical Director Pittman, Mountain View C.I. Lead Nurse Melton, Mountain View C.I. Administrator Slagle, Avery Mitchell C.I. Lead Nurse Penland, are responsible for supervising and monitoring the delivery of medical and dental care services to inmates, which must be provided consistent with community standards. He also named John and Jane Doe doctors, nurses, case managers,

---

[2] See (Doc. No. 8 at 53).

correctional officers, supervisors, "and any N.C. Dept of Public Safety/ Division of Prisons, employees, agents, or representatives whose work place are Mountain View Correctional Institution, Avery Mitchell Correctional Institution and any other prisons operated by the defendants charged with responding to requests for medical care for HCV Infections from now-unknown inmates within the NC prison systems." (Doc. No. 8 at 14). He claims that Defendants were deliberately indifferent by refusing to treat Plaintiff's disability, disease, and serious medical needs regarding Hepatitis-C infection in compliance with current standards of individualized professional medical care.

Plaintiff argues that NCDPS policy, and its employees' enforcement of it, amounts to cruel and unusual punishment, violates equal protection because Hepatitis-C is screened and treated differently from HIV, and violates the North Carolina Constitution. Further, he argues, the policy violates the ADA and RA because Hepatitis-C infected inmates are excluded from DPS programs that could result in gain time.

Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, and such other relief to which he is entitled. He also seeks preliminary injunctive relief for immediate treatment with the breakthrough drug therapy.

 (2)    **Defendants' Motion for Summary Judgment** (Doc. No. 62)

The remaining Defendants argue that summary judgment should be granted in their favor because none of the custody correctional staff, other employees, or executive managers have ever been involved in providing patient care to inmates. Only Smith was responsible for the creation, implementation, and modification of policies/ procedures/ guidelines regarding health services including HCV, and she did not consult or work with any of the Defendants on the HCV policy.

NCDPS's ADA and RA policy provides for reasonable accommodations. A

recommendation is made by the ADA coordinator and further review is done. The executive management and correctional staff, medical staff, and contractors are not involved in the ADA request and determination process. Plaintiff did not make an ADA request while housed at Avery-Mitchell but made two at Mountain View. The second ADA request was submitted after Plaintiff filed his Amended Complaint.

The Department Defendants are entitled to summary judgment because Plaintiff did not exhaust his available administrative remedies about his HCV claims before initiating this action; even if the claims were exhausted, none of the Department Defendants were involved in providing patient care to Plaintiff and cannot be deliberately indifferent. Of the 19 Defendants, only Uhren and D'Amico were involved in providing medical care to Plaintiff, and 15 of the 17 remaining Defendants were not involved in providing patient care. Penland and Renfro were registered nurses at Avery-Mitchell at the relevant times but there is no evidence to suggest that they provided care to Plaintiff. Only Smith was involved in the creation and implementation of HCV policy, and her actions do not support a claim of deliberate indifference.

Defendants argue that they are entitled to summary judgment on Plaintiff's deliberate indifference claims under the North Carolina Constitution because the § 1983 analysis governs.

They argue that the ADA and RA claims warrant summary judgment because none of the Defendants were involved in the ADA request and evaluation process and Plaintiff did not submit an ADA request before filing this action so he cannot satisfy the elements to establish an ADA or RA violation. Further, Plaintiff's state law claims including medical malpractice must be dismissed because Plaintiff did not comply with Rule 9(j).

Moreover, the Department Defendants are entitled to qualified immunity because their actions were reasonable.

Defendants further argue that Plaintiff's official capacity claims for compensatory and punitive damages are barred by the Eleventh Amendment, that the ADA and RA do not authorize suit for monetary damages against the Department Defendants in their individual capacities, and that Plaintiff's allegations do not support an award of punitive damages in their individual capacities.

For these reasons, Defendants argue, summary judgment should be granted and the case should be dismissed in its entirety.

**(3)** **Plaintiff's Responses** (Doc. Nos. 66, 71)

*Pro se* Plaintiff was informed of the importance of responding to Defendants' Motion for Summary Judgment and the legal standard applicable to such motions. (Doc. Nos. 65, 70). Plaintiff was cautioned that his failure to respond would probably result in the grant of relief that the Defendants are seeking. (Id.).

Plaintiff filed a Response, (Doc. No. 66), in which he attempts to rebut Defendants Uhren and D'Amico's Motion to Dismiss as well as the present Motion for Summary Judgment. He argues that his claims should be granted, that Rule 9(j) does not apply, that he requested HCV treatment numerous times, and that he is not required to exhaust administrative remedies before suing under ADA for relief including equitable relief (Doc. No. 66 at 10). He signed the Response before a notary "to the best of [his] knowledge…." (Doc. No. 66 at 11).

In a second Response, (Doc. No. 71), Plaintiff states that he is not required to exhaust administrative remedies under the ADA and that he considered disabled under the RA and ADA because he has an infectious disease. He also argues that Defendants are liable as supervisors because they failed to intervene in constitutional violations, and that the Court should consider the full medical records and that Judge Osteen granted immediate relief to three HCV-infected inmates

in a separate case. The Response was signed before a notary.

**(4)**     **Evidence**[3]

    **(A)**     **Affidavit of Renita Stroup** (Doc. No. 69-1)

Renita Stroup has been a Nurse Supervisor at Avery-Mitchell C.I. since November 2015 and, before that date, she was the Lead Nurse at Avery-Mitchell. Her responsibilities as Nurse Supervisor include serving as a supervisor for all other nursing and other healthcare staff who work in the Avery-Mitchell medical unit.

The types of staff at Avery-Mitchell who are directly involved in patient care to inmates are limited to registered nurses, licensed practical nurses, physician assistants, and medical doctors. While Stroup supervises various medical personnel, she is not directly involved in providing patient care to inmates. Not now, or at any time since she has worked at Avery-Mitchell, have Facility Administrators, Assistant Facility Administrators, or various other correctional staff (other than those listed above) been involved in providing patient care to inmates. Not now, nor at any time since Stroup has worked at Avery-Mitchell, have other employees and executive management of the Department such as the Director of Health Services for the Division of Prisons of the Department, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, been involved in providing patient care to inmates. Neither Stroup nor Defendants Smith, Pittman, Guice, Perry, and Ball were ever involved in providing patient care to inmates at Avery-Mitchell including Plaintiff. (Doc. No. 69-1 at 3).

    **(B)**     **Affidavit of Norma Melton** (Doc. No. 69-2)

---

[3] This section is not exhaustive. Records such as NCDPS policies and procedures speak for themselves. Therefore, they will be addressed as relevant in this Section and the Discussion Section, but they will not be separately summarized in the interest of judicial economy.

Defendant Melton is a Nurse Supervisor at Mountain View C.I. and was so employed between July 2012 and February 2016. Her responsibilities as Nurse Supervisor include serving as a supervisor for all other nursing and other healthcare staff who work in the Mountain View medical unit. The types of staff at Mountain View who are directly involved in patient care to inmates are limited to registered nurses, licensed practical nurses, physician assistants, and medical doctors. While Melton supervises various medical personnel, she is not directly involved in providing patient care to inmates.

Not now, or at any time since she has worked at Mountain View, have Facility Administrators, Assistant Facility Administrators, or various other correctional staff (other than those listed above) been involved in providing patient care to inmates. Not now, nor at any time since Melton has worked at Mountain View, have other employees and executive management of the Department such as the Director of Health Services for the Division of Prisons of the Department, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, been involved in providing patient care to inmates. Accordingly, neither Melton nor Defendants Bullis, Buchanan, Duckworth, Green Guice, Haynes, Perry, Pittman, Slagle, or Smith were ever involved in providing patient care to inmates at Mountain View including Plaintiff. (Doc. No. 69-2 at 3-4).

**(C)**      <u>**Affidant of Jason Penland**</u> (Doc. No. 69-3)

Jason Penland is the Correctional Assistant Superintendent for Programs at Avery-Mitchell C.I. and was so employed between July 2012 through January 2014, and April 2015 through February 2016. As Correctional Assistant Superintendent for Programs, his responsibilities include consulting with units on programs, policies, and classification, and assessing training of programs

staff. He is familiar with the Department's policy and procedure regarding reasonable accommodation for inmates with disabilities.

The purpose of the Department's ADA policy is to "establish policy and procedures regarding the Prisons' commitment to compliance with ADA and the [RA]." (Doc. No. 69-3 at 2). As the Assistant Superintendent for Programs at Avery-Mitchell, Penland serves as the Facility ADA Administrator pursuant to NCDPS ADA Policy. It is the policy of NCDPS to establish procedures for an inmate to request an accommodation for a qualified disability that affects a major life activity and to ensure that, among other things, reasonable accommodations are made to facility jobs, programs, activities and services to permit participation by a qualified inmate with a disability and that no qualified individual with a disability is excluded from participation or denied the benefits of jobs, programs, activities, or services solely due to such a disability. The ADA policy provides that eligible and otherwise qualified inmates with a disability shall have the same opportunities for access to jobs, programs, activities, or service options as non-disabled inmates. The ADA policy provides that inmates are informed of the amount of their Gain/Earned time during their scheduled case management contacts if an inmate disagrees with the assessment of Gain/Earned Time, the inmate may use the administrative remedy procedure pursuant to NCDPS policy.

The ADA Policy provides a detailed procedure for requesting a reasonable accommodation. Under this procedure:

    a.    The Inmate Reasonable Accommodation Request Forms (DC-746) are readily accessible to all inmates by any and all prison staff. Inmates are made aware of these forms during the facility orientation process during the admission process.

    b.    An inmate who has a disability that he/she believes is not being reasonably accommodated must submit a written request for accommodation using the Inmate Reasonable Accommodation Request Form ("Request Form") to his/her case

manager. The form must specify the disability and the accommodation or service sought.

c.       After the Request Form is completed it is sent to the Facility Disability Case Manager who then contacts the facility Mental Health Social Worker to start the review and evaluation process.

d.       After consultation with mental health and medical staff at the facility, the Mental Health Social Worker will note a recommendation to either approve or deny the request on a disability assessment form.

e.       The completed disability assessment form is then sent to the Facility ADA Coordinator for review and approval/denial of the recommendation.

f.       The Facility ADA Coordinator then reviews the request and the recommendations to determine whether he/she will approve or deny the recommendation. In either instance, the facility ADA Coordinator will forward the request, recommendation and their approval or denial, to the Prisons ADA Coordinator for further review and determination.

g.       If the Facility ADA Coordinator approves the recommendation that an accommodation be made, then the Facility ADA Coordinator must forward the approved Request Form to the Prisons ADA Coordinator.

h.       The Prisons ADA Coordinator then conducts their own review. If the Prisons ADA Coordinator concurs with the approval of the recommendation, then the Prisons ADA Coordinator sends the Request Form to a Prisons ADA Compliance Specialist to review and approve any changes to the job, program, activity or service being proposed to accommodate the inmate. After the ADA Compliance Specialist reviews and acts on the Request Form, the form is returned to the facility ADA Coordinator. The action of the Prisons ADA Coordinator and Prisons ADA Compliance Specialist is final.

i.       Once the Facility ADA Coordinator receives the Request Form, the Facility ADA Coordinator must proceed with implementing the approved ADA accommodation(s).

j.       If the inmate is no longer housed at that facility, the Facility ADA Coordinator must forward the Request Form to the Facility ADA Coordinator at the inmate's current housing facility.

k.       If the Facility ADA Coordinator does not approve the recommendation that an accommodation be made (or if the recommendation is that an accommodation not be made and the Facility ADA Coordinator concurs), then the Facility ADA Coordinator must forward the denied Request Form to the Prisons ADA

Coordinator for final decision making.

l.      If the Prisons ADA Coordinator disagrees and approves the request, then the process of review, approval, and implementation continues as though the Request Form was approved.

m.      If the Prisons ADA Coordinator agrees with the recommendation that the request be denied, then the denied Request Form is returned to the Facility ADA Coordinator who then must notify the inmate in writing of the decision.

n.      An inmate who has filed a Request Form which has been denied, and disagrees with the determination, may submit a Grievance through the Administrative Remedy Procedure.

This procedure is followed with each request for an accommodation received by the Facility. Penland has "no reason to believe that the procedure was not followed with regard to [Plaintiff]." (Doc. No. 69-3 at 5).

The ultimate authority to issue a determination regarding an inmate's request for an accommodation lies solely with the Prisons ADA Coordinator. In his capacity as the Facility ADA Administrator, Penland is aware of the individuals who are involved in the ADA request and determination process. Executive management of NCDPS, individual staff, and contractors who work at the facilities such as medical doctors, physician's assistants, and nurses, are not involved in the ADA request and determination process. Accordingly, Ball, Guice, Perry, Pittman, Smith, Stroup, Uhren, and Vaughn, have no involvement in the ADA request and determination process.

A review of Plaintiff's file, records, and other materials indicate that Plaintiff "did not submit any Request Form(s) while housed at Avery-Mitchell Correctional Institution." (Doc. No. 69-3 at 7).

**(D)      Affidavit of Dexter Gibbs** (Doc. No. 69-5)

Dexter Gibbs is the Correctional Assistant Superintendent for Programs at Mountain View C.I. Between July 2012 and January 2014, he was the Program Director and between April 2015

and February 2016, he was the Correctional Assistant Superintendent for Programs at Mountain View C.I. As Correctional Assistant Superintendent for Programs, his job responsibilities include consulting with units on programs, policies, and classification, and assessing training of programs staff. He is familiar with the Department's policy and procedure regarding reasonable accommodation for inmates with disabilities, the purpose of which is to establish policy and procedures regarding the Prisons' commitment to compliance with the ADA and RA. As Correctional Assistant Superintendent for Programs at Mountain View, Gibbs is the ADA Coordinator for the facility pursuant to NCDPS ADA Policy.

The ultimate authority to issue a determination regarding an inmate's request for an accommodation lies solely with the Prison's ADA Coordinator. Executive management of the Department and individual staff and contractors who work at a given facility, such as medical doctors, physician's assistants, and nurses, are not involved in the final determination of an ADA request. As such, Defendants Bullis, Buchanan, D'Amico, Duckworth, Green, Guice, Haynes, Melton, Perry, Pitman, Slagle, Smith, and Uhren "have no involvement in the ADA request and determination process." (Doc. No. 69-5 at 6).

A review of Plaintiff's filed, records, and other materials indicates that Plaintiff filed two Request Forms at Avery-Mitchell C.I. The first Request Form was submitted August 22, 2016. (Doc. No. 69-7 at 1). Plaintiff noted his disability as "end stage liver disease" among others and requested accommodations to his work assignment as a result of his claimed disabilities. (Doc. No. 69-5 at 7). The first Request Form was processed in accordance with procedures. The disability assessment form for the first Request Form was provided to Gibbs as the Facility ADA Coordinator with a recommendation that it be denied. (Doc. No. 69-7 at 2-3). Gibbs agreed with the recommendation and forwarded the first Request Form to the Prison ADA Coordinator accordance

to procedures. The Prison ADA Coordinator reviewed and agreed with the recommendation that the request be denied because Plaintiff was eligible for and assigned to a full-time program and was receiving appropriate sentence credits. (Doc. No. 69-7 at 4). On November 17, 2016, Plaintiff signed the determination indicating that he was served with written notice of the denial of his first Request Form. (Id.).

The second Request Form was submitted on January 17, 2017. (Doc. No. 69-8 at 1). Plaintiff noted his disabilities, including end stage liver disease, and requested accommodation to his work assignment as a result of his claimed disabilities. The second Request Form was processed according to procedures. The disability assessment form was provided to Gibbs as the Facility ADA Coordinator with the recommendation that the request be denied. (Doc. No. 69-8 at 2-3). Gibbs agreed with the recommendation and forwarded the second Request Form to the Prison ADA Coordinator in accordance with procedure. The Prison ADA Coordinator reviewed and agreed with the recommendation that the request be denied because Plaintiff was eligible for and assigned to a full-time program and was receiving appropriate sentence credits. (Doc. No. 69-8 at 4). On February 28, 2017, Plaintiff singed the determination indicating that he was served with written notice of denial of his second Request Form. (Id.).

Gibbs searched for, and found, two grievances filed by Plaintiff with respect to the denial of these two ADA requests. Plaintiff filed a grievance on October 16, 2016, regarding the denial of his first Request Form. (Doc. No. 69-9 at 1). The grievance worked its way through the normal grievance process. The Inmate Grievance Resolution Board determined that there was no supporting evidence that staff violated any applicable policy in the handling of Plaintiff's ADA requests and dismissed his grievance. (Doc. No. 69-9 at 5). Before the grievance had reached Step Three, Plaintiff again filed a grievance related to the first Request Form. (Doc. No. 69-9 at 6-7).

The Inmate Grievance Board dismissed the grievance because an active grievance relating to the same subject matter was already in progress. (Doc. No. 69-9 at 8).

**(E)  Affidavit of Paula Smith, M.D.** (Doc. No. 69-10)

Defendant Smith served as the Medical Director for the Division of Adult Correction and Juvenile Justice of NCDPS from 2001 until her retirement in December 2017. As Medical Director of Adult Correction, her responsibilities included planning, directing, and supervising the medical services staff and clinical care in all correctional facilities statewide. She was also responsible for regulatory compliance and professional best practices efforts across the correctional institutions as well as for communicating those standards with other executive management such as the Director of Adult Correction and the Commissioner of the Department.

During her time as Medical Director, Smith was involved in the creation and implementation of various portions of the Health Services Policy & Procedure Manual including the parts of the Clinical Practice Guidelines. The Clinical Practice Guidelines section of the Health Services Policy and Procedure Manual provides guidance to primary care physicians who provide care to incarcerated persons in the custody of the Division of Adult Corrections. Section CP-7 is intended to provide guidance with regards to Hepatitis C. Defendant was personally involved in the creation and implementation of the September 1, 2009 (Doc. No. 69-11), June 1, 2013 (Doc. No. 69-12), and October 1, 2015 (Doc. No. 69-13), versions of CP-7. (Doc. No. 69-10 at 2).

While creating and implementing the 2009 version of CP-7, Defendant Smith "reviewed and consulted many sources of information, including but not limited to guidelines from the American Association for the Study of Liver Diseases, medical journal articles, peer-review studies, policy and procedure manuals from other correctional settings, and many more." (Doc. No. 69-10 at 2). She also "consulted with outside experts in liver diseases. (Id.). Each time CP-

13

was modified and updated, Defendant Smith "again, reviewed and consulted many sources of information, and consulted with outside experts in liver diseases." (Doc. No. 69-10 at 3).

The policies, procedures, or guidelines related to health services were "created, implemented, and modified, to facilitate the provision of adequate medical care for incarcerated persons in the custody of the Division of Adult Correction." (Doc. No. 69-10 at 3). As Medical Director, Defendant Smith was responsible for and oversaw the creation, implementation, and modification of policies, procedures, or guidelines related to health services such as CP-7. In doing so, she worked with certain employees of the Department including the Deputy Medical Director and the Infection Control Coordinator, but she did not work with the Secretary of the Department, the Commissioner of the Division of Adult Correction, the Nurse Supervisor for the Department, any correctional facility administrators, or individual health care providers at any particular facilities. Accordingly, she did not work with Defendants Ball, Buchanan, Bullis, D'Amico, Duckworth, Greene, Guice, Hayes, Melton, Penland, Perry, Pitman, Renfro, Slagle, Smith, Stroup, Uhren, or Vaughn, nor were they involved in, the creation, implementation, or modification of any version of CP-7.

### (F)    Requests & Grievances

| 8/17/2016 | Administrative Remedy Procedure, Mountain View C.I.: Plaintiff asks immediate treatment for HCV and pain medication (Doc. No. 66-1 at 5) |
|---|---|
| 8/22/2016 | Inmate Reasonable Accommodation Request: impairments are "end stage liver disease, extreme diabetes with severe neuropathy;" seeking "ADA gain time." (Doc. No. 69-7 at 1) |
| 8/30/2016 | Evaluation Criteria for Persons Under the ADA: recommending denial (Doc. No. 69-7 at 2) |
| 9/15/2016 | Inmate Reasonable Accommodation Request Determination Form: "denied;" "Inmate is currently assigned to a full-time program, receiving appropriate level of sentence credits." (Doc. No. 69-7 at 4) |

| | |
|---|---|
| 10/16/2016 | Administrative Remedy Procedure, Mountain View C.I.: Plaintiff asks for ADA accommodations and night school, and nine days per month for his disabilities. (Doc. No. 66-1 at 2) |
| 10/27/2016 | Administrative Remedy Procedure, Mountain View C.I.: seeking ADA gain time of nine days per month, correct the "wrongs" that Green and Duckworth has done to Plaintiff and requesting an apology. (Doc. No. 69-9 at 7) |
| 10/31/2016 | Screening Response: Grievance rejected because there is an active grievance in process. (Doc. No. 69-9 at 8) |
| 11/3/2016 | Step-One Unit Response: "Your ADA request was forwarded to the ADA Division Coordinator in Raleigh NC on 9/8/16 for review…." (Doc. No. 69-9 at 3). |
| 11/7/2016 | Administrative Remedy Procedure, Mountain View C.I.: requests treatment from an outside doctor for his rash (Doc. No. 66-1 at 4) |
| 11/21/2016 | Step-Two Response: "Investigation into this matter has been conducted and the following has been found: Inmate was removed from the GED class on 11/07/16, after refusing to go to class. Inmate is not eligible for ADA assignment at this time; however, inmate is eligible for job or programs offered at this facility, thus the assignment to the GED program. Inmate did mention that he is interested in getting assigned to the part-time GED program offered at facility and he is encouraged to do so. No further action is recommended." (Doc. No. 69-9 at 4) |
| 11/28/2016 | Step-Three Response: no evidence that staff has violated any applicable policy, grievance dismissed. (Doc. No. 69-9 at 5) |
| 12/29/2016 | Administrative Remedy Procedure, Mountain View C.I.: requests treatment by an outside doctor for his rash (Doc. No. 66-1 at 7) |
| 1/24/2017 | Inmate Reasonable Accommodation Request: impairments of "end stage liver disease, neuropathy," restrictions apply to his activities; requests "my 9 days gain time." (Doc. No. 69-8 at 1) |
| 1/25/2017 | Evaluation Criteria for Persons Under the ADA: recommending denial; "Inmate appears eligible to participate in … program to earn sentence reduction credits." (Doc. No. 69-8 at 2) |
| 1/30/2017 | Inmate Reasonable Accommodation Request: "denied;" "Inmate is currently assigned to a job, receiving appropriate level of sentence credits." |

(Doc. No. 69-8 at 4)

## II. LEGAL STANDARDS

**(1)** <u>**Summary Judgment**</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458, 459-60 (4th Cir. 1979). The law is clear that a plaintiff cannot rely on an unverified complaint in opposing a motion for summary judgment. See Berry v. Atlantic Coast Line R. Co., 273 F.2d 572 (4th Cir. 1960).

Plaintiff has filed an unverified Amended Complaint and has failed to respond to Defendants' Motions for Summary Judgment. Therefore, the affidavits and records filed by Defendants are considered unrefuted and are accepted as true.

**(2)    Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516 (2002). Exhaustion is mandatory. Id. at 524 (citation omitted); Jones v. Bock, 549 U.S. 199, 211 (2007). Exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id. A prisoner is not entitled to exhaust administrative remedies during the pendency of an action. Cannon v. Washington, 418 F.3d 714, 719 (7th Cir. 2005); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999). The PLRA requires

17

"proper" exhaustion, that is, "using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits).'" <u>Woodford v. Ngo</u>, 548 U.S. 81, 90 (2006) (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002)).

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." <u>Jones</u>, 549 U.S. at 218. It is well settled that a grievance does not have to mention a defendant by name so long as the grievance gives the defendant fair notice of the claim. <u>See</u> <u>Moore v. Bennette</u>, 517 F.3d 717, 729 (4th Cir. 2008) (NC DPS's administrative remedy procedure does not require a plaintiff to name each defendant in his grievances). However, regardless of whether a particular defendant is named in a grievance, if the grievance fails to give prison authorities fair notice of, and the opportunity to address, the problem that will later form the basis of the suit against that defendant, dismissal of that defendant is appropriate. <u>See</u> <u>Davidson v. Davis</u>, 2015 WL 996629 at *3 (W.D.N.C. Mar. 6, 2015) (citing <u>Johnson v. Johnson</u>, 385 F.3d 503, 516-17 (5th Cir. 2004)).

**(3)** **Deliberate Indifference**

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan,</u> [511 U.S. 825, 832 (1994)]." <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016). First, "Farmer's objective prong requires plaintiffs to demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'" <u>Scinto</u>, 841 F.3d at 225. In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal

quotation marks and citation omitted).

As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. See Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). To state a case of deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* Farmer, 511 U.S. at 825. However, mere negligence or malpractice does not violate the Eighth Amendment. Miltier, 896 F.2d at 852. "[M]ere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." Scinto, 841 F.3d at 225 (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)).

**(4)      North Carolina Constitution**

The North Carolina Constitution prohibits "cruel and unusual punishments." N.C. Const. Art. I, § 27. North Carolina Courts and lawmakers have "long recognized the state's duty to provide medical care to prisoners" under its common law and statutory duties as well as under the state and federal constitutions. Medley v. N.C. Dep't of Corr., 412 S.E.2d 654, 657 (N.C. 1992). The North Carolina Supreme Court has recognized that "Article I, Section 27 of the North Carolina

Constitution provides a prohibition similar to the Eighth Amendment's Cruel and Unusual Punishment Clause." Id. at 659 (finding that the plaintiff failed to state a claim that DOC had violate his state or federal constitutional rights);[4] see also Leonard v. Bell, 803 S.E.2d 445 (N.C. App. 2017) (acknowledging that the duty to provide health services to inmates has a basis in the U.S. and N.C. Constitutions); see, e.g., State v. Green, 502 S.E.2d 819 (N.C. 1998); State v. Bronson, 423 S.E.2d 772 (N.C. 1992); State v. Rogers, 374 S.E.2d 852 (N.C. 1989).

With regards to medical malpractice claims, North Carolina has substantive legal requirements that a person must follow to pursue such claims. A plaintiff asserting negligence must prove the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, a causal relationship between the breach of duty and the plaintiff's alleged injuries, and certain actual injury or loss sustained by the plaintiff. Camalier v. Jeffries, 460 S.E.2d 133, 136 (N.C. 1995); Blackwell v. Hatley, 688 S.E.2d 742, 746 (N.C. App. 2010). North Carolina Rule of Civil Procedure 9(j) states in relevant part that any complaint alleging medical malpractice by a health care provider pursuant to G.S. 90-21.11(2)a. in failing to comply with the applicable standard of care under G.S. 90-21.12 shall be dismissed unless:

> (1) The pleading specifically asserts that the medical care and all records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;
>
> (2) The pleading specifically asserts that the medical care and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a person that the complainant will

---

[4] Justice Martin suggested in his Medley concurrence that arguing that the disjunctive "cruel *or* unusual punishment" language in the N.C. Constitution means that its standard "imposes at least the same duty [as the U.S. Constitution's Eighth Amendment], if not a greater duty." However, the N.C. Supreme Court noted several years later that "research reveals neither subsequent movement toward such a position by either this Court or the Court of Appeals nor any compelling reason to adopt such a position." Green, 502 S.E.2d at 828 n.1.

seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or

(3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.

N.C. R. Civ. P. 9(j).

Failure to comply with Rule 9(j) is ground for dismissal of a state medical malpractice claim filed in federal court. See, e.g., Estate of Williams–Moore v. Alliance One Receivables Mgmt. Inc., 335 F.Supp.2d 636, 649 (M.D.N.C. 2004); Frazier v. Angel Med. Ctr., 308 F.Supp.2d 671, 676-77 (W.D.N.C. 2004); Moore v. Pitt County Mem'l Hosp., 139 F.Supp.2d 712, 713-14 (E.D.N.C.2001); see also Thigpen v. Ngo, 558 S.E.2d 162, 165 (N.C. 2002). The North Carolina General Statutes defines a "[m]edical malpractice action" as "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care provider." N.C. Gen. Stat. 90-21.11(2)a.

## (5)    Americans with Disabilities Act

To establish a prima facie case under Title II of the ADA, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. See Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131(2). A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. Rather, the public entity is obligated to make those

modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." Miller v. Hinton, 288 Fed. Appx. 901, 902 (4th Cir. 2008) (quoting Bircoll v. Miami-Dade County, 480 F.3d 1072, 1082 (11th Cir. 2007)). The Fourth Circuit has held that the ADA does not recognize a cause of action against employees in their individual capacities. Baird, 192 F.3d at 471; see also 42 U.S.C. § 12132 (providing a remedy only against a "public entity"). Punitive damages are not recoverable under the ADA. Barnes v. Gorman, 536 U.S. 181 (2002).

**(6)      Rehabilitation Act**

To establish a prima facie case under the Rehabilitation Act, a plaintiff must prove that: (1) he has a disability; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit "due to discrimination solely on the basis of the disability." Atkins v. Holder, 529 Fed. Appx. 318, 319-20 (4th Cir. 2013). The Rehabilitation Act has a stricter causation requirement than the ADA in that the disability must be the sole cause, as opposed to one of multiple causes, of the discrimination. See Thomas v. Salvation Army S. Territory, 841 F.3d 632, 641 (4th Cir. 2016). The Fourth Circuit has noted that the RA does not permit an action against individual defendants. See Z.G. by and through C.G. v Pamlico Co. Pub. Sch. Bd. of Ed., 744 Fed. Appx. 769, 781 n.20 (4th Cir. 2018). Punitive damages are not recoverable under the RA. Barnes, 536 U.S. at 181.

**(7)      Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has

done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Almonte v. City of Long Beach</u>, 478 F.3d 100, 106 (2d Cir. 2007); <u>see</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(8)**     **<u>Qualified Immunity</u>**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. <u>Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 784 (4th Cir. 1993) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted). Where the defendant's entitled to immunity turns on a factual dispute, that dispute is resolved by a jury at trial. <u>Id.</u> (citing <u>Turner v. Dammon</u>, 848 F.2d 440 (4th Cir. 1988), *overruled on other grounds by* <u>Johnson v. Jones</u>, 515 U.S. 304 (1995)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III. DISCUSSION

### (1) Exhaustion of Administrative Remedies

Defendants assert, and Plaintiff fails to present evidence to the contrary, that he failed to put NCDPS on fair notice of his claims regarding the alleged longstanding denial of HCV breakthrough drug treatment, or NCDPS policy regarding HCV treatment, in any grievance that was exhausted before the Complaint was filed. See (Doc. No. 58). Therefore, summary judgment

will be granted in favor of all Defendants due to Plaintiff's failure to exhaust his administrative remedies.

**(2)**     **<u>Eighth Amendment Deliberate Indifference</u>**

Defendants argue that they should be granted summary judgment because they were not involved in providing medical care and are not liable as supervisors. There is only evidence that Defendants Uhren and D'Amico provided care to Plaintiff, but they have been granted summary judgment because, *inter alia*, they were not deliberately indifferent to Plaintiff's serious medical needs. (Doc. No. 58). Any claims of deliberate indifference against their supervisors necessarily fail. <u>See</u> <u>Waybright v. Frederick Co, Md.</u>, 528 F.3d 199, 203 (4th Cir. 2008) ("supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages."). Of the remaining Defendants, only Renfro and Penland are medical providers. However, there is no evidence to suggest that either of them provided any medical care to Plaintiff. Plaintiff has failed to rebut this assertion.

The Defendants who are not medical providers had no involvement in the creation or implementation of NCDPS HCV Policy and therefore they cannot be deliberately indifferent with regards to that policy. Defendant Smith is the only Defendant who was personally involved in the creation and implementation of NCDPS HCV Policy. The unrefuted record demonstrates that Defendant Smith was not deliberately indifferent with regards to the creation and implementation of NCDPS's HCV Policy. She created, revised, and implemented the Policy based on her own knowledge as a physician, review of publications and other written materials, and consultation with experts in the field. Plaintiff has failed to support his conclusory allegations that NCDPS's policy failed to provide adequate care or subjected him to the excessive risk of serious harm.

Plaintiff's mere disagreement with the care provided under NCDPS Policy fails to demonstrate deliberate indifference. See Scinto, 841 F.3d at 225. Moreover, to the extent that Plaintiff suggests Defendant Smith was negligent in creating and implementing NCDPS's HCV Policy, this falls short of the deliberate indifference standard. Miltier, 896 F.2d at 852.

Plaintiff has failed to create a genuine dispute of material fact establishing deliberate indifference either in the medical treatment he received or in the creation and implementation of the HCV policy. Therefore, the NCDPS Defendants' Motion for Summary Judgment on Plaintiff's deliberate indifference claims will be granted.

**(2)**      **North Carolina Constitution**

Plaintiff seeks relief for cruel or unusual punishment under the North Carolina Constitution Article 1, Section 27.

This Court has previously recognized that "the analysis for Plaintiff's claim under the N.C. Constitution would be nearly (if not, then exactly) identical as its analysis under the Federal Constitution." Griffin v. Mortier, 2018 WL 6060472 at *5 (W.D.N.C. Aug. 14, 2018), *report and recommendation adopted*, 2018 WL 6046184 (W.D.N.C. Nov. 19, 2018). Because Defendants are entitled to summary judgment on Plaintiff's medical deliberate indifference claims under the Eighth Amendment's cruel and unusual punishment clause, see Section III(a), supra, they are likewise entitled to summary judgment based on the N.C. Constitution's cruel or unusual punishment clause.

To the extent that Plaintiff intends to assert medical negligence claims against any of the Defendants, they are subject to dismissal because Plaintiff has failed to satisfy the pre-suit requirements under North Carolina law. See N.C. R.Civ. P. 9(j). Plaintiff's conclusory contention that Rule 9(j) does not apply is unsupported by any evidence and is legally incorrect.

Therefore, Defendants' Motions for Summary Judgment will be granted on Plaintiff's claims for relief under North Carolina law.

**(3)**     **ADA and RA**

Defendants argue that NCDPS executive management is not involved in the ADA request and evaluation process, that Plaintiff did not submit an ADA request before filing this action, and that Plaintiff has failed to demonstrate that any Defendants discriminated against him in any way on the basis of his alleged disability.

The evidence demonstrates, and Plaintiff has failed to refute, that none of the Defendants had any role in handled Plaintiff's two requests for accommodations. Further, the evidence demonstrates that NCDPS handled his requests appropriately and in accordance with its protocol. His requests for gain time were denied because he was already receiving gain time because he was eligible for through his participation in job assignments.

To the extent that Plaintiff suggests that the Defendants denied him proper care by failing to provide medication and treatment for his HCV, these allegations cannot support relief under the ADA and RA. See Miller, 288 Fed. Appx. at 903 (affirming summary judgment for prison officials on prisoner's ADA claim that the institution denied him access to colostomy bags and catheters because he failed to show that he was treated in this manner because of his disability); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners…."); Thomas, 841 F.3d at 641 (RA has a stricter causation requirement than the ADA).

Plaintiff has failed to come forward with any evidence refuting Defendants' evidence or demonstrating the existence of a genuine dispute of material fact. Therefore, Defendants will be granted summary judgment on Plaintiff's ADA and RA claims.

**(4) Qualified Immunity**

Defendants argue that they are entitled to qualified immunity because their actions were reasonable and that they had no reason to know that their conduct could violate Plaintiff's clearly established constitutional or statutory rights.

Defendants have prevailed on summary judgment with regards to each of the alleged violation of his constitutional and statutory rights and, Defendants have submitted uncontroverted evidence demonstrating that their conduct was reasonable. They had no reason to know that they were violating any of Plaintiff's clearly established constitutional or statutory rights through their actions or inactions. Defendants are therefore entitled to qualified immunity.

**(5) Damages**

**(A) Official Capacity**

Plaintiff's claims against Defendants for damages under § 1983 in their official capacities are equivalent to suits against the State and are barred by the Eleventh Amendment. <u>See</u> <u>generally</u> <u>Will</u>, 491 U.S. at 66; <u>Graham</u>, 473 U.S. at 166; <u>see</u>, <u>e.g.</u>, <u>Hutto</u>, 773 F.3d at 549. Therefore, no damages are available on Plaintiff's § 1983 claims against Defendants for damages in their official capacities.

**(B) Individual Capacity**

The ADA and RA do not authorize a suit for monetary damages against Defendants in their individual capacities. <u>Baird</u>, 192 F.3d at 471; <u>Z.G.</u>, 744 Fed. Appx. at 781 n.20. Therefore, no damages are available against Defendants in their individual capacities on Plaintiff's RA and ADA claims.

**(C) Punitive Damages**

A jury may be permitted to assess punitive damages in a § 1983 action when the

defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" <u>Smith v. Wade</u>, 461 U.S. 30, 51 (1983). Punitive damages are not available under the ADA or RA. <u>Barnes</u>, 536 U.S. at 181.

Plaintiff's allegations do not support an award of punitive damages against any of the Defendants on his § 1983 claims. Aside from his own conclusory, unsupported and unverified allegations, Plaintiff has presented no evidence to support a finding that the NCDPS Defendants acted with malice or with willful intent to deprive him of his constitutional rights. Therefore, punitive damages are not available.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is granted. The Clerk of Court will be instructed to enter judgment in favor of the Defendants and close this case.

**IT IS, THEREFORE, ORDERED** that:

1.   Defendants' Motion for Summary Judgment, (Doc. No. 62), is **GRANTED.**

2.   The Clerk of Court is instructed to close this case.

Signed: May 6, 2019

Frank D. Whitney
Chief United States District Judge